DETROIT POLICE OFFICERS ASSOCIATION
*v.* CITY OF DETROIT

OPINION OF THE COURT

1. MUNICIPAL CORPORATIONS—ORDINANCES—EMPLOYEES—RESIDENCE.
   The Detroit Common Council had the power to pass an ordinance requiring most of its employees to reside therein (Detroit Ordinance 327-G).

2. CONSTITUTIONAL LAW — EQUAL PROTECTION — CLASSIFICATIONS — STATUTES — ORDINANCES.
   Constitutional provisions relating to equal protection of the laws permit classification in statutes and ordinances based on natural distinguishing characteristics bearing a reasonable relation to the object of the legislation (US Const, Am 14; Const 1963, art 1).

3. MUNICIPAL CORPORATIONS—ORDINANCES—EMPLOYEES—RESIDENCE —POLICE OFFICERS.
   An ordinance requiring police officers and most other employees of the city to reside therein but permitting waiver of this requirement for employees in the classified service is valid in its totality because a policeman's job has "natural distinguishing characteristics" from all other city employees as the police force is a semi-military organization subject at all times to immediate mobilization, which distinguishes this type of employment from every other in the classified service (Detroit Ordinance 327-G).

REFERENCES FOR POINTS IN HEADNOTES

[1, 3]  56 Am Jur 2d, Municipal Corporations § 247.
[2]  16 Am Jur 2d, Constitutional Law §§ 488, 494.
[4, 7, 8]  16 Am Jur 2d, Constitutional Law §§ 488, 494; 56 Am Jur 2d, Municipal Corporations § 247.
[5]  56 Am Jur 2d, Municipal Corporations § 98 *et seq.*
[6]  56 Am Jur 2d, Municipal Corporations §§ 247, 343, 346.
[9]  56 Am Jur 2d, Municipal Corporations § 372.

Concurring Opinion
T. E. Brennan and T. G. Kavanagh, JJ.

4. Municipal Corporations — Ordinances — Police Officers — Residence — Employees — Classifications — Legislative Determination.

> *There is nothing invidious about the classification in an ordinance which requires police officers to be residents of the city but permitting waiver of this requirement for employees in the classified service as the classification amounts to nothing more than a legislative determination that the nature of a police officer's work is such that he ought to be a resident of the city; the residency requirement is not designed solely to assure that the officer has a greater stake in the city but is also intended to bring about a more cooperative attitude among the citizenry with whom the police are in daily contact; the constabulary is unique among the municipal departments; and special treatment of police residency puts them in the category of judges and other elected city officials.*

Opinion Concurring in Part, Dissenting in Part.
Adams and Williams, JJ.

5. Municipal Corporations — Charters — Ordinances — Police Commissioner.

> *No intent to except the police commissioner of the City of Detroit from the operation of validly enacted city ordinances can be gleaned from the language of that city's charter.*

6. Municipal Corporations — Charters — Legislative Power — Common Council — Ordinances — Employees — Residence — Equal Protection.

> *The legislative power of the City of Detroit is vested exclusively in the common council by the city charter under which, subject to equal protection limitations, the council's determination that an ordinance enacted by it to require most of the employees of the city to reside therein would promote the general health, safety, welfare and good government of the city was a policy decision within the bounds of legislative discretion (Detroit Charter, Title 3, Ch 1, § 1; Detroit Ordinance 327-G).*

7. Municipal Corporations — Employees — Residence — Police Officers — Constitutional Law — Equal Protection — Classifications.

> *A classification in an ordinance allowing a waiver of residence in the city to employees in the classified service when it "would*

serve the best interest of the city" but denying it cate-
gorically to police officers, in order to be upheld under the
equal protection clauses of the United States and Michigan
Constitutions, must be based upon a real and substantial dif-
ference having reasonable relation to the object of the legis-
lation (US Const, Am 14; Const 1963, art 1; Detroit
Ordinance 327-G).

8. MUNICIPAL CORPORATIONS — ORDINANCES — POLICE OFFICERS —
RESIDENCE — CONSTITUTIONAL LAW — EQUAL PROTECTION — CLAS-
SIFICATION.

A classification in an ordinance allowing a waiver of residence
in the city to employees in the classified service when it
"would serve the best interest of the city" but denying it cate-
gorically to police officers is devoid of rationality by denying
that which is in the best interest of the city to police officers,
the classification foregoes any claim it might have to a reason-
able relation to a legitimate governmental purpose and denies
to police officers the equal protection of the law (US Const,
Am 14; Const 1963, art 1; Detroit Ordinance 327-G).

9. MUNICIPAL CORPORATIONS — ORDINANCES — POLICE OFFICERS —
RESIDENCE — CONSTITUTIONAL LAW — CONSTITUTIONAL PORTIONS.

The words "police officers" in the second section of an ordinance
providing that all police officers, appointees in the unclassified
service, with certain exceptions, and all persons in the classi-
fied service of the City of Detroit shall reside therein are
unconstitutional, void and of no effect; the remainder of the
ordinance is left intact under a provision of an ordinance of
that city that when a portion of an ordinance is declared un-
constitutional, those portions not declared unconstitutional are
to be unaffected (Detroit Ordinances § 1-1-6, 327-G).

Appeal from Wayne, Thomas Roumell, J., and
from Court of Appeals prior to decision. Submitted
May 5, 1971. (No. 18 April Term 1971, Docket No.
52,678.) Decided August 27, 1971. Rehearing
denied September 28, 1971. Appeal dismissed by
the United States Supreme Court February 28, 1972
for want of a substantial Federal question.

Complaint by the Detroit Police Officers Associa-
tion and others against the City of Detroit for a de-
claratory judgment that a Detroit ordinance and a

rule of the police department are unconstitutional
and invalid and for an injuction restraining the en-
forcement of that ordinance and rule.    Judgment
for plaintiffs.    Defendant appealed to the Court of
Appeals and applied to the Supreme Court for leave
to appeal prior to decision by the Court of Appeals.
Leave granted.    Reversed.

*Livingston, Gregory, Van Lopik & Higle,* for
plaintiffs.

*Michael M. Glusac,* Corporation Counsel, and
*John R. McKinlay,* Assistant Corporation Counsel
(*Miller, Canfield, Paddock & Stone,* of counsel), for
defendant.

SWAINSON, J.    I agree with the opinion of Justice
WILLIAMS that the trial court erred in holding that
the Detroit Common Council did not have the power
to pass Ordinance 327-G.

I dissent from Part IV of my Brother's opinion
which holds that Ordinance 327-G violates the equal
protection clauses of the United States Constitution
and of the Michigan constitution.

The test for validity under the equal protection
clauses, as noted by Justice WILLIAMS, is stated in
*Tracer* v. *Bushre* (1968), 381 Mich 282, 286, 287:

" 'These constitutional provisions [the Federal
and state equal protection clauses] do not mean that
there can be no classification in the application of
statutes and ordinances, but only that the classifica-
tion must be based on natural distinguishing char-
acteristics and must bear a reasonable relation to the
object of the legislation.' *Cook Coffee Co.* v. *Village
of Flushing* (1934), 267 Mich 131, p 134."

The job of a policeman does have "natural distin-
guishing characteristics" from all other city employ-
ees.    There is a special relationship between the

community policed and a policeman. A policeman's very presence, whether actually performing a specified duty during assigned hours, or engaged in any other activity during off-duty hours, provides a trained person immediately available for enforcement purposes.

Policemen are required by department order to be armed at all times, and why is this? Simply because by such requirement they are, no matter where they are or what they are doing, immediately prepared to perform their duties. They are charged with law enforcement in the City of Detroit, and obviously must be physically present to perform their duties. The police force is a semi-military organization subject at all times to immediate mobilization, which distinguishes this type of employment from every other in the classified service.

I would reverse the decision of the trial court and hold that Ordinance 327-G is valid in its totality.

T. M. Kavanagh, C. J., and Black, T. E. Brennan, and T. G. Kavanagh, JJ., concurred with Swainson, J.

T. E. Brennan, J. (*concurring*). I cannot agree with the conclusion of my Brother Williams.

He would hold that the residency ordinance invidiously discriminates against police officers, because no waiver is permitted for them.

By striking the words "police officers" from the first sentence of the ordinance, my Brother would simply amend the ordinance to eliminate all residence requirements for police officers.

What remains is a requirement that firemen and all other classified employees must reside in the city unless they obtain waivers, but *policemen are free to live elsewhere without waivers.*

Having concluded that policemen have been discriminated against, he would correct the situation by discrimination in their favor.

Personally, I disagree with the major premise. I find nothing invidious about the classification which requires police officers to be residents of the city.

That classification amounts to nothing more than a legislative determination that the nature of a police officer's work is such that he ought to be a resident of the city.

One of the most sensitive problems in law enforcement today is the relationship between the police and the black community. Over 40% of the people of Detroit are black. Less than 10% of the population of suburban Wayne, Oakland and Macomb Counties is black.

The Common Council of the City of Detroit has made a difficult legislative judgment, weighing the desirability of having a resident police force on the streets against the detriment of losing many experienced, dedicated and courageous officers who choose to live in the suburbs.

The common council has chosen a course which will make it more difficult to recruit policemen and keep them. But it has also chosen a course which will make recruitment of black officers more imperative.

The residency requirement is not designed solely to assure that the officer has a greater stake in the city. It is also intended to bring about a more cooperative attitude among the citizenry with whom the police are in daily contact.

The common council wants—desperately needs— to promote a feeling of trust, confidence and fraternity between the people of Detroit and their police department.

In that respect and in this time, the constabulary is unique among the municipal departments.

Special treatment of police residency puts them in the category of the judges and other elected officials of the city. That classification is at least debatably productive of proper municipal goals.

I see no reason for this court to substitute its judgment for that of the elected legislative body of the City of Detroit.

I would reverse the judgment of the trial court.

T. G. KAVANAGH, J., concurred with T. E. BRENNAN, J.

WILLIAMS, J. (*concurring in part and dissenting in part*). This case has three issues. The first is whether the Detroit Common Council can legislate a residency requirement for city employees that includes city police—or whether any residency requirement for policemen is the exclusive authority of the Detroit Police Commissioner. The second is whether the common council has legal authority to legislate a residency requirement for city employees. The third is the validity of Detroit Ordinance 327-G (§§ 2-1-1.1–2-1-1.3 of the Municipal Code of the City of Detroit) which unqualifiedly required its police officers to reside in the city while permitting the residence requirement to be waived under certain conditions for most other city employees.

I

Ordinance 327-G was unanimously adopted by the Common Council of the City of Detroit on May 17, 1968, after a public hearing, and became effective on June 8, 1968. It reads as follows:

"Sec. 2-1-1.2.  Residence construed to be actual domicile.  Residence shall be construed to be the

actual domicile of the individual where he normally eats and sleeps and maintains his normal personal and household effects.

"Sec. 2-1-1.3. Residency requirement for certain employees; waiver of residency requirement. All police officers, appointees in the unclassified service, except the director of the zoo and superintendent of the House of Corrections, and all persons working in any branch of the classified service of the city shall reside in the city. The civil service commission may waive the residency requirement for employment in the classified service upon a finding that such waiver would serve the best interest of the city. When waiving the residency requirement, the civil service commission shall base their determination upon: (1) The nature of the work. (2) The location of the work, and (3) All other pertinent facts concerning employment. The Commission shall promptly report any waiver of residency requirement to the mayor and the common council."

Plaintiff, Detroit Police Officers Association, hereinafter called D.P.O.A., is the recognized and exclusive collective bargaining representative of the approximately 3,200 patrolmen and policewomen who are employed by the Police Department of the City of Detroit, most of whom are members of plaintiff D.P.O.A. Of the individual plaintiffs, plaintiff Whall is a resident of the City of Detroit and desires to move his residence outside of the city. Plaintiff Mierzejewski is a resident of the City of Lincoln Park, Michigan. Plaintiff O'Reilly is a resident of Redford Township, Michigan. All of the individual plaintiffs are patrolmen employed by the Police Department of the City of Detroit and are members of plaintiff D.P.O.A.

Plaintiffs contend that the ordinance in question is an infringement of the powers delegated to the police commissioner by the Charter of the City of

Detroit, that it is beyond the scope of the powers granted to the common council by the charter to enact an ordinance requiring all police officers to reside in the city and that the instant ordinance is a violation of the equal protection of the law.

The trial court held that the residency requirement of Ordinance 327-G attempts to regulate the internal rules and regulations of the police department and contravenes the city charter which places the power to make these rules in the police commissioner. The trial court also held that the ordinance discriminates arbitrarily against police officers as contrasted with all other city employees by denying them the same conditional waiver of residency and in so doing denies them the full protection of the laws. From the decision of the trial court, leave to appeal directly was granted by this Court.

## II

With respect to plaintiff's claim that Detroit Ordinance, 327-G is an infringement of the powers of the Detroit Police Commissioner, the powers and duties of both the common council and the police commissioner are defined in the Charter of the City of Detroit. It is to that document that we must look in determining the relationship between the common council and the Commissioner of Police.

The common council is vested by the charter with the legislative power of the city.[1] Its legislative powers and duties include the following among others:

1. "To enact ordinances to carry into effect the powers conferred and the duties imposed upon the city by the constitution and the laws of the state, to make operative the provisions of this charter and to promote the general peace, health, safety,

---

[1] Detroit Charter, Title 3, ch 1, § 1.

welfare and good government of the city * * * " [2]

2. "To execute all legislative powers of the city including the power to adopt, continue, amend and repeal city ordinances * * * " [3]

3. to "enact such ordinances as may be necessary to carry out the provisions" of specified chapters dealing with the powers and duties of various executive officers and departments,[4] one of which is the chapter dealing with the office of Commissioner of Police.[5]

The Commissioner of Police, on the other hand, is an officer of the executive branch, "who shall be appointed by the mayor and who shall have charge of the police department."[6] The charter provides that:

"The powers and duties of the commissioner which shall be exercised and performed as herein provided and in accordance with the laws of the state and the ordinances of the city, shall be as follows:

"(a) He shall assume and exercise supervision over the police department and make all proper rules for the government and discipline thereof;

* * *

"(d) May change the titles of police officers and employees under him, except deputies, designating such titles as he may see fit, creating whatever offices and positions he may deem necessary for the proper organization and conduct of the department.

* * *

"(m) Shall have such other powers as are herein prescribed or may be necessary hereunder for the proper discharge of his duties."[7]

---

[2] Detroit Charter, Title 3, ch 1, § 12(d).

[3] Detroit Charter, Title 3, ch 1, § 12(t).

[4] *E.g.*, Detroit Charter, Title 4, ch 15 (dealing with the Board of Fire Commissioners), § 25.

[5] Detroit Charter, Title 4, ch 21, § 37.

[6] Detroit Charter, Title 4, ch 21, § 1.

[7] Detroit Charter, Title 4, ch 21, § 5.

In addition, the police commissioner has whatever additional duties, liabilities, rights and powers not inconsistent with the charter as the common council may prescribe by ordinance.[8]

The above cited section of the charter specifically makes the powers and duties of the police commissioner subject to the ordinances of the city. This language is not dissimilar to language governing the duties and powers of other officers of the executive branch, whose duties and powers must be exercised "in accordance with the general ordinances of the city."[9] These officers include the Commissioner of Public Works,[10] the Parks and Recreation Commissioner,[11] the City Planning Commissioner,[12] the Public Lighting Commission,[13] the Board of Water Commissioners,[14] the Board of Health,[15] the Board of Fire Commissioners,[16] the Commissioner of Buildings and Safety Engineering,[17] the Arts Commission,[18] the Commissioner of Purchases and Supplies,[19] the Board of Commissioners of the House of

---

[8] Title 3, ch 1, § 12(p) of the Charter of the City of Detroit provides that one of the legislative powers and duties of the Common Council is:

"To prescribe by ordinance additional duties and liabilities and confer additional rights and powers upon all officers, elective or appointive, not inconsistent with this Charter;  *  *  *  ." In addition Title 4, ch 1, § 12 of the charter, one of the general provisions dealing with the executive department, provides:

"In addition to the rights, powers, duties and liabilities of officers prescribed in this Charter, all officers, whether elected or appointed, shall have such other rights, powers, duties and liabilities, subject to and consistent with the provisions hereof as the common council may deem expedient and shall prescribe by ordinance."

[9] See the following citations in footnotes 10 through 25.

[10] Detroit Charter, Title 4, ch 8, § 18.

[11] Detroit Charter, Title 4, ch 9, § 13.

[12] Detroit Charter, Title 4, ch 10, § 12.

[13] Detroit Charter, Title 4, ch 11, § 13.

[14] Detroit Charter, Title 4, ch 12, § 21.

[15] Detroit Charter, Title 4, ch 14, § 17.

[16] Detroit Charter, Title 4, ch 15, § 25.

[17] Detroit Charter, Title 4, ch 16, § 18.

[18] Detroit Charter, Title 4, ch 19, § 12.

[19] Detroit Charter, Title 4, ch 20, § 14.

Correction,[20] the Corporation Counsel,[21] the Zoological Park Commission,[22] the Civic Center Commission,[23] the Detroit Historical Commission,[24] and the Streets and Traffic Commission.[25] The language above is identical to that governing the exercise of powers and duties of the Public Welfare Commission.

No intent to except the police commissioner from the operation of validly enacted city ordinances can be gleaned from the language of the charter. Consequently, if a residency requirement for most city employees is within the legislative powers of the common council granted by the charter, police officers as well as other city employees are subject to the requirement.

## III

As to the second issue, the common council authority to enact Ordinance 327-G, the pertinent legislative powers granted by the charter to the common council are listed above. Included among them is the power "to enact ordinances　*　*　*　to promote the general　*　*　*　health, safety, welfare and good government of the city" and "to exercise all legislative powers of the city." A determination that to require most of the employees of the city to reside in the city would promote the "general health, safety, welfare and good government of the city" is the kind of policy determination that a legislative body is empowered to make.

This Court in *Williams v. Civil Service Commission of the City of Detroit* (1970), 383 Mich 507,

[20] Detroit Charter, Title 4, ch 22, § 17.
[21] Detroit Charter, Title 4, ch 23, § 15.
[22] Detroit Charter, Title 4, ch 25, § 12.
[23] Detroit Charter, Title 4, ch 26, § 13.
[24] Detroit Charter, Title 4, ch 28, § 12.
[25] Detroit Charter, Title 4, ch 29, § 13.

upheld a similar residency requirement. Rule VII of the Civil Service Commission of the City of Detroit imposed a residence requirement upon all persons in the city civil service. It was subject to waiver, if the interest of the city would be best served and justice to the employee so required for upholding the requirement, this Court said (pp 517, 518):

"Therefore, the question of whether or not to make residence within a city a condition of public employment is one which must be largely addressed to the legislative branch of government. This is not to say that under all circumstances such a requirement would be reasonable and valid."

The legislative power of the city is vested exclusively in the common council. Accordingly, under the charter and subject to the equal protection limitations discussed later, the council's policy decision was within the bounds of legislative discretion. The requirement of residence within the city for most city employees thus became one of those "ordinances of the city" in accordance with which the powers of the police commissioner must be exercised and his duties must be performed.[26]

---

[26] Plaintiffs-appellees contend that the residency requirement is in effect an order to discharge police officers who live outside the city and that under the charter the power of removal and appointment of police officers is vested in the police commissioner, quoting the following language from *Slavin* v. *Detroit* (1933), 262 Mich 173, 176:

"While it is true that the council may indirectly control the number of officers and employees by limiting the appropriation, the right of appointment and removal, increase and decrease of the force, still remains in the hands of the police commissioner * * * ." Sec. 5(d) of Chapter 21 of Title 4 of the charter which enumerates the powers and duties of the Commissioner of Police provides that he:

"May change the titles of police officers and employees under him, except deputies, designating such titles as he may see fit, creating whatever offices and positions he may deem necessary for the proper organization and conduct of the department;"

*Slavin, supra,* is inapposite. In *Slavin* it was contended that the Police Commissioner of the City of Detroit was without authority to

IV

We turn now to the third question of whether Ordinance 327-G violates the equal protection clauses of the Fourteenth Amendment of the United States Constitution and Article 1 of the Michigan Constitution of 1963. The ordinance makes residence within the city a mandatory condition of employment for all police officers of the City of Detroit. For police officers, there are no exceptions to this requirement. The residence requirement may be waived, however, for persons in any branch of the classified service. Such a waiver is conditioned upon a finding that, in an individual case, a waiver would serve the best interest of the city, considering the nature of the employee's work, the location of his work and all other pertinent facts concerning employment.

Under the classification established by the ordinance, a waiver is allowed to persons in any branch of the classified service when it "would serve the best interest of the city," but is denied categorically to police officers. To uphold the classification, it must be based upon a real and substantial difference having reasonable relation to the object of the legislation. As stated in *Rinaldi* v. *Yeager* (1966), 384 US 305, 308, 309:

---

effect reductions in manpower for economy reasons and that such authority rested solely in the Common Council of the City of Detroit. *Slavin* held that the police commissioner, in the circumstances listed, did have a right of removal under the charter. The power of the common council to effect removals was not at issue.

Plaintiffs-appellees also contend that the ordinance in question usurps the power of the police commissioner, under the charter, to make "all proper rules for the government and discipline" of the police department granted by subsection (a) of § 5 of chapter 21 of Title 4 of the charter. Subsection (a) is merely one of the powers and duties of the commissioner enumerated under § 5, all of which must be "exercised and performed as herein provided and in accordance with the laws of the state and the ordinances of the city", a provision the effect of which in controlling its subsections we have already discussed.

"The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes. *McLaughlin* v. *Florida* [1964], 379 US 184, 189, 190 [85 S Ct 283, 13 L Ed 2d 222]. It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. 'The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same.' *Tigner* v. *Texas* [1940], 310 US 141, 147 [60 S Ct 879, 84 L Ed 1124]. Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' *Baxstrom* v. *Herold* [1966], 383 US 107, 111 [86 S Ct 760, 15 L Ed 2d 620]; *Carrington* v. *Rash* [1965], 380 US 89, 93 [85 S Ct 775, 13 L Ed 2d 675]; *Louisville Gas Co.* v. *Coleman* [1928], 277 US 32, 37 [48 S Ct 423, 72 L Ed 770]; *Royster Guano Co.* v. *Virginia* [1920], 253 US 412, 415 [40 S Ct 560, 64 L Ed 989]."

This constitutional test has been reiterated by this Court in *Tracer* v. *Bushre* (1968), 381 Mich 282, 286, 287:

" 'These constitutional provisions [the Federal and state equal protection clauses] do not mean that there can be no classification in the application of statutes and ordinances, but only that the classification must be based on natural distinguishing characteristics and must bear a reasonable relation to the object of the legislation.' *Cook Coffee Co.* v. *Village of Flushing* (1934), 267 Mich 131, p. 134."

The enactment of the residence requirement represents a decision by common council that certain benefits are acquired for the city by requiring most

city employees to reside within the municipality.[27]
It then, by allowing a waiver of the residence re-
quirement when waiver is in the best interest of the
city, implicitly states that, in an individual case, the
benefits attained for the city by allowing a waiver
outweigh the assumed detriment of an employee's
outside residence.

By asserting that even when a waiver is in the
best interest of the city and that even when it is al-
lowed to an employee in the classified service under
the same circumstances, a waiver will be denied to
a police officer solely because he is a police officer,
the ordinance is self-defeating. Such a classification
is devoid of rationality. Any legitimate govern-
mental purpose must be in the best interest
of the city. By denying that which is in the
best interest of the city to police officers the classifi-
cation foregoes any claim it might have to a reason-
able relation to a legitimate governmental purpose.

The city argues that the ordinance does nothing
more than recognize the facts of a policeman's em-
ployment which in its normal course, is never out-
side the boundaries of the city. Hence, says the city,
since waivers are only allowed for work-related ex-
ceptions there is no reason to permit a waiver for
police officers.

Policemen in their relation to the location of their
work are substantially similar to firemen, who are
in the classified service and have an opportunity for
waiver of residence. Both work substantially with-
in the city and both may be called out of the city

[27] The usual reasons given have been most succinctly stated in
*Williams* v. *Civil Service Commission of the City of Detroit* (1970),
383 Mich 507:

" * * * Is a residence requirement a mere remnant of feudalism
or sound administration to secure from a city employee better per-
formance, community pride, interest in participation in city affairs,
payment of city taxes, and so on? With the trial judge, we con-
clude that all of these questions are debatable."

in the performance of their duties as a result of the mutual aid pact between Detroit and several nearby municipalities.

However, even if the city's view of the peculiar locational requirements of a policeman's work is accepted, the ordinance cannot be read so narrowly as the city suggests. Location of employment is only one of the factors to be considered in determining whether a waiver will be granted to classified service employees. The civil service commission in considering a waiver can also consider the nature of the employee's work and "all other pertinent facts considering employment." This language on its face gives broad discretion to the civil service commission to inquire into the circumstances of each individual case, location of work being only one of these circumstances, and arrive at a solution that will genuinely "serve the best interest of the city." Such an inquiry can, for example, balance the benefits obtained to the city by the retention of a competent, industrious employee who, due to some family hardship, is forced to live across the municipal line, against the assumed detriment of his outside residence if a waiver would serve the best interest of the city, it is granted to an employee of the classified service. A competent, industrious policeman under the same circumstances when faced with the same situation is now denied the benefit of this kind of determination.

As well as being definitionally detrimental to the city the classification's denial of a waiver to police officers which is in the best interest of the city while at the same time granting such a waiver to employees of classified service denies to police officers the equal protection of the law.

We are thus faced with a situation in which that portion of Ordinance 327-G which applies to police

officers is unconstitutional. Sec. 1-1-6 of the Municipal Code of the City of Detroit provides:

"Should any section, paragraph, sentence, clause, phrase or word of this Code be declared invalid or unconstitutional by a court of competent jurisdiction, such invalidity or unconstitutionality shall not affect any of the remaining words, phrases, clauses, sentences, paragraphs or sections of this Code, since the same would have been enacted by the common council without the incorporation in this code of such invalid or unconstitutional word, phrase, clause, sentence, paragraph or section."

The spirit of the above cited provision is that when a portion of an ordinance is declared unconstitutional, those portions of the ordinance not declared unconstitutional are to be saved if at all possible in light of the ordinance's purpose. By excepting police officers from the application of the ordinance, we can fulfill the common council's desire to leave that portion of the ordinance not declared unconstitutional unaffected. Therefore, we hold that the words "police officers" in the first sentence of § 2-1-1.3 of the Municipal Code of the City of Detroit are unconstitutional, void and of no effect and leave the rest of the ordinance intact. See *Baldwin* v. *North Shores Estates Association* (1970), 384 Mich 42, 54, *Robison* v. *Wayne Circuit Judges* (1908), 151 Mich 315, 322.

We emphasize that in our decision today we only consider the application of Ordinance 327-G to police officers and to no other individual or group. We express no opinion concerning the validity of the ordinance as applied to representative persons not now before this Court.

The trial court is reversed in part and affirmed in part.

ADAMS, J. concurred with WILLIAMS, J.